Good morning, Mrs. Court. My name is Terry Anastasio Ropers Majeski. I'm appearing on behalf of Appellant Neville Chemical. As the Court is aware, this is a CERCLA action by which the State of California seeks to recover costs it claims to have incurred in monitoring and responding to contamination on property owned by Neville Chemical. The case presents an opportunity to this Court to clarify application of the six-year statute of limitations within CERCLA in a way that this Court has not previously spoken, or on a subject this Court has not previously spoken, although a number of California district courts have spoken. The parties agree that the six-year statute of limitations set forth in 42 U.S.C. 9613 applies here. That statute says that suit must be filed by the State if they're going to seek to recover their costs within six years, and I'm quoting, after initiation of physical on-site construction of the remedial action. Now, in this case, the underlying facts are not disputed. In January 1993, the State of California, through the DTSC, approved a plan by which Neville Chemical would install three groundwater extraction wells, and in April 1994, the extraction wells were installed. Those extraction wells ultimately formed virtually the only operative facility by which Neville Chemical remediated the contamination on the property. The State of California didn't file suit until six years and five months later. Now, the dispute between the parties is whether installation of those three extraction wells, pursuant to the DTSC's approval in January 1993, constitutes the initiation of physical on-site construction of the remedial action. And the rule that the State of California urges is that nothing that Neville Chemical could have done prior to final approval by the State of California of a remedial action plan can start that statute of limitations running. I want to note to begin with the fact that the statute does not focus on approval. The statute does not focus on paperwork. The statute focuses on initiation of physical on-site construction of the remedial action. As I say, the Ninth Circuit has not yet addressed whether construction of facilities that are, in fact, the remedial action that addresses contamination can start the six-year statute of limitations running before a final remedial action plan has been approved. The statutory language is incredibly murky and difficult. What standard would you suggest? What standard would I suggest? I would suggest that the Court adopt the standard set forth in the Highenpahm Lumber case and the AMD case. Highenpahm is out of the Eastern District of California. And in that case, there was a remedial action plan that had been approved, but not gone through the public hearing process. It was subject to final evaluation as to its effectiveness. All right. We apply that standard in this case. Don't you, Lou? Pardon me? We apply that standard in this case. Do you win? Absolutely, Your Honor. By that standard, our instance in the... When was the draft remedial action plan in this case? In our case? Yes. The plan was approved in January 1993, and the State of California didn't file suit until September 2000. There was a draft? What plan was approved? A draft proposed, I should say, remedial action plan. That was submitted by Nettle Chemical in September 1992, and that was submitted pursuant to... That was a draft final remedial action plan? Yes, Your Honor. That's not my impression. What do we do with the letter from the State, December 16, 1994, which says, Okay. We like your report. Please provide a schedule for submittal of the draft remedial action plan. The fact... That was in December of 94. In October of 94. That's not the final approval of it. That's a different date from the final approval. Right. And the December 1994 letter obviously comes within the six-year statute, and that's the date that the State of California urges on this Court. The fact is that the State had already approved a plan expressly intended to be remedial, a plan of installation of these three wells, a plan that constituted the only operative remediation that was ultimately approved. From the time from January... I know it happened ultimately, but... Pardon me? I know it happened ultimately, but the State seems to think that it was telling you at that point to submit your remedial action plan draft so that that would suggest it didn't think it actually had a remedial action plan draft in front of it even. Your Honor, the cases Highenpahm and AMD expressly state that the form of the paperwork that is going forward at the time that remedial action is commenced is not what the Court should look to. Those cases are quite different. Those are not cases where no draft remedial action plan had even been submitted yet, are they? With respect, Your Honor, I beg to differ. In AMD, that was exactly what the Court focused on. The Court said that the ultimate record of decision filed in September 1991, and I'm quoting, was the first statement of what the final remedy was to be. Here, the first statement of what the final remedy was to be was the proposed plan submitted in September 1992... No, I thought before that they were saying, we're not sure that's going to be the plan. We've got to check out an awful lot of things. And finally they decided, well, okay, now that we've done all the checking we have to do about what would be appropriate remediation, now we want you to submit a draft remedial action plan. That's what they say. In AMD. Absolutely, Your Honor. And it's distinguishable from this case on the exact, I need a word, procedural, the paperwork, exactly the thing that makes it distinguishable from our case is why AMD supports our position. In our position... Excuse me. The document in January 22nd, 1993 is called Neville Chemical Company Removal Action Proposal, right? Yes, that's correct, Your Honor. And that's the one that you're saying was a draft remedial action plan. Yes. But it's not what it says it is, and later there was one. So it doesn't, it seems to me that it's claiming it was not that. Your Honor, the cases from the district court expressly state that the label that people put... Well, I understand that. But the fact is that in this instance there was a set of interim measures that may or may not, as the state kept telling you over and over again, be sufficient for the final plan. And there was a lot of, there was a feasibility study before the final draft remedial action plan. And for you to come up and represent that this was that seems to me to be totally untrue. Well, Your Honor, I respectfully disagree. In both the High and Palm case out of the Eastern District of California and the Navistar case out of the Second Circuit, in both of those cases, the operations that were commenced were done pursuant to paperwork that expressly stated we're going to have to look at this and see if it works. But in both cases, the remediation that was commenced... As remediation. Pardon me? At least as remediation. In this instance, there was nothing to indicate that this project was commenced as remediation. It was hoped that it would be a remediation, but it wasn't commenced as remediation. Your Honor, we believe that the case authority and the better rule is that the label that's placed on that is not what the statute intends should be looked at and is not the rule that the Court should announce. And if this Court announces this rule, the statute of limitations will not commence until the State of California decides it should, because they have at their behest the ability to do final approval of a final remedial plan any time they want. And in the meantime... I asked you when I started up, I asked you what the proper rule should be. And you said it should be the draft remedial action plan. But you don't have a draft remedial action plan within the statutory period. I mean, that would be a clean-cut matter, which is not completely under control of the State, but it doesn't work here. Your Honor, I admit that we don't have a document with the title draft remedial action plan, but what we have is a draft plan with all of the remedial action incorporated into it, a plan ordered pursuant to the DTSC's letter October 25th, I'm sorry, order, October 25, 1991, in which it states, We want you to come up with remediation that will be consistent with the final solution. A remediation plan that was in fact what the final solution was, regardless of the fact that the State of California looked at other options, including do-nothing options, that were never considered seriously. The fact that the State of California, as it should have, looked to see if this was in fact working, all of that is fine, but to announce a rule that gives the State of California the opportunity to set the beginning of the statute of limitations any time they want, and in the meantime, require complete remediation, I'm sorry? If we were to adopt it, I'm — I go along with you, probably, so far as to say that the final — that the statute doesn't suggest that there's a definite paperwork cutoff. And so there may be some other set of criteria, but if we were to adopt criteria that were, for example, consistent with the high-impact case, that would not be so — as you keep insisting, that would not be up to the State of California irrevocably, right? I'm sorry, Your Honor, I missed the last sentence. So what you're saying is that the draft affirmative action plan is something you — or menial action plan is something you submit, right? Yes. So therefore, when you keep saying over and over again that that would be within the control of the State of California, that's not true. Oh, no. I'm sorry if I misstated, Your Honor. What I'm saying is that their approval of that plan prior to our installation of the three extraction wells means that the installation of the three extraction wells, which was certainly initiation of physical on-site construction of the remedial action as the statute requires, that's what started the statute of limitations running, not the — not the signing off on the paperwork, but as the statute calls for, the activity that actually initiated physical on-site construction. Suppose after you — you say, okay, we're going to put in three wells, and you put them in, and it turns out that something else really needs to be done. That just isn't going to work, okay? So there are going to have to be three different wells or some vastly different solution. You would say that time still starts running? I would say that that is a factual inquiry that would be very problematic for the case, because in the Mafra case, they had this way. The question — the problem is, if the time does not necessarily start running then, then the statute of limitations becomes a look-back situation, doesn't it? Absolutely. So maybe it starts and maybe it doesn't. Absolutely. That's what you would say. Yes. If it turns out that that's golden, then it started. And if it's not golden, it didn't start. Is that right? Yes, Your Honor. But this is not an onerous statute of limitations. The State of California doesn't have 90 days to go yea or nay. This is a six-year statute of limitations. And the Second Circuit very specifically said, we want to encourage States, we're going to enforce the statute of limitation, because we're going to — we want to encourage parties to act on their rights with leave of the court. I'm so extremely confused about why it is that you're telling us that this January removal action, which the party told you in September was an interim measure to prevent further migration, and it's not a department-approved remedial action plan, it cannot be construed as such, and so on, was, in fact, a draft remedial action plan. Well, Your Honor, I think if one looks at the October 1991 order, and one looks at the plan submitted, one looks at the January 1993 approval, and one looks at the final plan approved by the Court that the State finally labeled final remedial action plan, I believe that the conclusion is inescapable that this was the commencement of remedial action on this property. With leave of the court, I'd like to reserve just a couple minutes for reply. Thank you, Your Honor. Very well. Good morning. May it please the Court. My name is Harrison Pollack. I'm a deputy attorney general appearing on behalf of the California Department of Toxic Substances Control. I'd like to start by addressing this question of what had happened before these wells were installed in April of 94. There's an unfortunate coincidence in this case, perhaps, in terms of acronyms, which is that a removal action plan, which is what took place and was submitted before April of 94, has the initials RAP, or RAP, and the final remedial action plan, which did not happen until May of 95, also has the same initials, RAP. And as Judge Berzon's questions indicated, what happened before April of 94 was all related to a removal action. There's no question that what was taking place before April of 94 was a removal action. We do agree that the key date here is September of 1994. We argue further that it is impossible that the remedial action could have taken place before September of 94. Why September of 94? Why is that the key date? That is the key date because that's six years before the lawsuit was commenced. I know. But what happened in September of 94 that makes it the key date? I'm asking, what would you run the time period from? Okay. We would like to see the time period begin to run with construction of a remedial activity after that remedial action has been selected. And in this case ---- I finally flipped. When was it finally selected? That was your argument. That was your statute. It finally flipped. Yes. We are arguing that the remedial action was not finally selected until the approval Where is that statute? Where is that? Oh, okay. That is not in the statute. And we would agree that the bright-line test that has been rejected in past cases is not, in fact, the test that should be applied here, although we do feel there is a bright-line test. What is in the statute is that the statute of limitations begins to run after construction of the remedial action. And there are what is further in the regulations that the Department must follow, for example, the MCP, there are rules about how that final remedy or the remedial action can be selected. For example, the statute requires that the public be given opportunity to comment, to review and to comment on the final remedy. And that comment period happens after the draft remedial action plan is put out for public review, in this case in March of 95, and before the Department makes its final decision. And so there has to be a presumption, at least, that the Department complied with its legal obligation to not make up its mind about the final remedy until, indeed, it did approve of that final wrap. Now, the question, this is a practical and maybe silly question, but it strikes me that we have a whole bunch of very difficult and troublesome statute of limitations cases because, for some reason, the States and other actors here wait six plus, two months' time, six years plus two months' time after whatever the contested dates are. I mean, you could very well have filed years ago and we never would have had this document. Why does this keep happening? Well, Your Honor, I mean, what I can say in that regard, first of all, is that Congress did give the State a six-year period. And secondly — Well, that's true, but you're creating a difficult legal question for no one. They're in that six years. Why do you have to cut it so short? Well, in this case — The party probably lost the file. No, that did not happen in this case. In this case, for the past six years and through today, the party, Neville, is conducting the cleanup, and different actions are occurring. But he would bring a second lawsuit for the additional money. The statute specifically says so, no? Well, that is true. But one of the purposes of CERCA is to avoid piecemeal litigation. Now, what the Department strives to do, first of all, is to use its resources to initiate lawsuits that it needs to, to recover its costs when it needs to. And secondly, to the extent it is able to do this, it does wait until it has accrued as many costs as it can bring in a single lawsuit in order to have a single lawsuit so that it does not have to file piecemeal litigation. Now, Congress designed CERCA to allow this to happen. For example, there is a three-year statute of limitations that runs after the completion of a removal action. However, in order to allow the Department or other government entities to have a longer to — to — when it does bring a lawsuit to recover more of its costs, as long as that lawsuit is brought within three years of the complete — I'm sorry. As long as the remedial action begins within three years of the completion of the removal action, then the Department is able to wait to bring a lawsuit to recover its removal action costs, and instead to bring a single lawsuit, single lawsuit as happened here. And that actually gets to the point that opposing counsel has been making about you don't want to give the Department discretion to complete control over the statute of limitations. Well, one of the reasons the Department does not have that control is that if it wants to recover its removal action costs, which in this case and in many others are quite substantial, then it has to get on with the remedial action within three years of completing the removal action. Furthermore, if Neville or another party were concerned that the Department was simply dragging out the process, then it could seek a writ in order to compel the Department to take action, to approve that final remedial action. The — So let's get back to what is your ultimate standard. I don't understand it. Are you arguing that it is the final — that until there's a final approval, there's no statute of limitations trigger, or are you arguing something short of that? Your Honor, that is the ultimate standard that we are arguing. However — It is that there has to be a final approval. It is that there has to be a final approval. Or it wasn't that. Excuse me? You admitted that that's not in the statute. So where are you getting it from? We're getting that — well, first of all, let me just say that we would not need that standard to prevail in this case. I understand. Okay. But as far as where we're getting that from is that the statute has requirements for the remedial action, and also the NCP, which are the regulations for implementing the statute, have requirements that must be followed before the final remedy is selected. For example — But there's a definition in the statute of remedial action, and that isn't there. Well, the cases that have rejected a bright-line test earlier have observed correctly so, I think, that if the test were simply anything before there's a final wrap is a removal action, anything after the final wrap is a remedial action, then it is true that the statute would not need those lengthy explanations. But in fact, you can have the final wrap, a decision of what the remedy will be, and you can still have removal actions taking place. You still need to be able to distinguish between the two. And that actually gets to what was at issue in the Navistar case. The Navistar case, the wrap in that case was a Federal cleanup, so the rod or record of decision was finalized one or two years before the events that were at issue in that case. What was at issue there was the amount of time it took to approve the final remedial design. In other words, what would the design would be of the remedial action. So that follows the remedial action plan? Yes. That follows the remedial action plan. The remedial action plan is actually a, it's a rather narrative document. It describes in layman's terms or it attempts to be in layman's terms what the remedy will be that has been selected. The step before the remedial action plan is the RIFS, the Remedial Investigation Feasibility Study. In this case, that was approved in December of 94. That evaluates several different alternatives, alternative remedies, including a no-action alternative. And that, and that tentatively identifies a remedy that the responsible party or the Department then puts together this narrative document called the wrap or remedial action plan. That is circulated, after that is approved in draft form by the Department, that is circulated for the public to have an opportunity to review it. And the requirement. Let's go back to the statutory language. Okay. We have a definition of remedy or remedial action means those actions consistent with permanent remedies. It doesn't, and that's a very considerate language to use. It doesn't say, it says consistent with permanent remedy. And if that's, if we're addressing whether it was after the permanent remedy, it would have said, was determined, it would have said so. It doesn't say that. Well, what the statute says, it's section 9613G2B, is that the six-year statute of limitations begins after initiation of physical on-site construction of the remedial action. And what we are saying here is that you cannot possibly, as a matter of logic, have construction of a remedial action until you know what that remedial action is. And the statute requires, for example, well, let me say what it requires, and I'll tell you where. It requires the opportunity for the public to review and comment on the final remedy. At 42 U.S.C. 9613K2B, it requires public review. It also, at the regs, at 40 CFR section 300.430F31i, and also in the California Health and Safety Code at sections 25356.1e and 25358.7, which require the department to adhere to these Federal standards, all of those are locations where the statute or the regs require the department to allow the public a chance to review the proposed remedy and to comment on it. You know, counsel, you're getting me, two things you said are getting me slightly confused. They seem to be slightly juxtaposed. Early on, you said, we're not asking for that bright-line rule that it begins when the remedial action plan is actually approved. We're not asking for that, you said. And since then, it seems to me that that's precisely what you're asking for. So tell me what I'm missing. Let me clarify. When I said at first that we're not asking for the bright-line rule, the bright-line rule we are not asking for is a rule that says simply, every activity that occurs on-site before there's a final wrap is a removal action. Every activity after the wrap is a remedial action. That is not the bright-line that we are proposing. But your bright-line is that the statute can't start running until there's an actual final approval. Yes. So the bright-line is, in fact, it's not. It sounds kind of like what those cases said they didn't like. Well, that's true. But the reason I distinguish between the bright-line we are or are not advocating. So what you would like us to do is adopt a bright-line rule different from what the other authorities say. Yes. That's true. And, yes. And if we didn't, if we said, well, we're not sure we're ready to do that, then your fallback position would be the December letter that said present a plan? Or what would your fallback position be? I mean, what are the lines of resentment that you retreat to as you push back and back? Well, I suppose if pushed, I would start by saying the line has to be the final remedial action plan. The next position I would fall to would be the draft remedial action plan, because that is the document where. When the draft is submitted by the party or when you. It's actually, it's submitted by the party and then it's approved by DTFC. And at that point, it's circulated for public review. So your second position would be when you approve the draft plan. The draft plan. All right. And what would be your third one? Well, I suppose the third one would be when the Department approves the RIFS. And the reason I say that is that that document, in addition to analyzing various alternatives for the permanent remedy, it does highlight one as the remedy to focus on for the, for the, for the rap. And the reason that even if we were forced to take that position, which we do not take, but if we were, that the RIFS is the report, the reason we would say the Court still should affirm the district court's ruling in this case is that here the RIFS was not submitted by Neville or finalized or approved by DTFC until December of 94. And in the hiampum case. That's that December 16th letter. Was it December 16th? Could you please provide a schedule for submitting the draft remedial action plan? I believe so. December of 94. Yes. The approval is at record 342. And I believe it was. Yeah. So that that would be. OK. Yeah. Again, in that RIFS, the RIFS is evaluating various remedies, three of which includes that did not include these ground water extraction wells, which would be a reason why we do not think that that should be the line to the extent there is a line. In the hiampum case, which appellant relies on strongly, it's worth pointing out that while certain activities were considered by that court to have been initiation of construction of the remedial action, only the activities that took place after there was a draft were so held. The hiampum court at 903XUP 1389, page 1393, did analyze a fence that was constructed before the RIFS was completed and before the draft wrap. And the court said this fence was installed more than nine months before the draft wrap was issued, and while RIFS testing was still ongoing, it then went on to hold that that fence therefore clearly had to be part of the removal action. And so even if hiampum were correct, that the remedial action could begin before the final approval of a wrap. Yes, but one thing. If we adopted your ultimate right by test, wouldn't we be discouraging prompt remediation? I mean, in this, we would basically be telling the parties that anything, that you ought to go slow and wait until there's a final plan before you do anything, because otherwise you're going to trigger over the patient period and get or not trigger, I'm trying to figure it out. It seems to me that you're discouraging the parties from going forward if we do that. No. To the contrary, Your Honor, I think that it would be discouraging the parties to move forward quickly to address what is at bottom the ultimate issue here, threats to the environment and the public health, if you were to hold that removal actions could be, their description as a removal action could be changed with hindsight if that removal action eventually is incorporated into the final remedy. The NCP, the National Contingency Plan, actually says that to the extent practicable, the government should try to incorporate removal actions into the final remedy. And the reason for that, one reason for that at least, besides cutting costs for the responsible party, is that it allows the department or EPA or, you know, the government entity to order a removal action quickly without the lengthy review process that is necessary and called for before deciding on the permanent remedy. In fact, if you look at the January of 1991 letter. It's a post on one of the, there's a draft remedial action plan and the responsible party says, no, I'm just going to get this remediation done right now, I'm just going to start building this in a minute, because I'm pretty sure this is going to be what it's going to turn out. So he does that, gets it built, and then it takes a while until the final plan is finally approved, but it is approved, and then years later he's sued by the government for the cost, right? Yes. That's your version. Yes. And you're basically saying, well, no harm, no foul, because it's only a limitation period? Is that why? No. Well, in that case, if the, first of all, if there's an immediate threat from the, that will be caused from the spread of these hazardous substances, then the department would approve a removal action. I understand. Okay. Now. It's just a good diet and you get it done. Right. If they went ahead and decided to get it done, it puts the department in a bind if you were to treat the real party's actions as triggering the statute of limitations. And here's what the bind is. The department cannot approve the initiation of that remedial action without going through the full regulatory process. And if the department wants to approve it. It's really so difficult if they're firing the department when you still have three years to bring a lawsuit or four years or five years. Well, I mean, the lawsuit, remember, is, this lawsuit is to recover the department's oversight costs. It has nothing to do with the actual cleanup or the department's, you know, its activities in overseeing the cleanup or allowing the cleanup to go forward. That was this lawsuit that Neville has brought up in its second argument having to do with the department's conducts. The lawsuit that was filed in the State court back in the 80s was actually a lawsuit to get Neville to clean up the site, to get injunctive relief. And the department lost no time in bringing that because there was a threat. Now, as far as the department's decision to wait until when it did to bring the lawsuit to recover its costs for the oversight, that is an entirely separate decision from – it is entirely removed from any of the substantive decisions affecting the actual cleanup. If the Court were to adopt a standard whereby the activity, physical activities on a site that are removal actions when they're conducted but subsequently become remedial actions for purposes of statute of limitations, or if the Court were to allow the real – excuse me, the responsible party to simply decide when to start the remedial action and to call it a remedial action, then what that would do is it would encourage the department to actually, you know, to try to order the site up in a way that distinguishes between removal and remedial action for a reason. It allows the cleanups to happen expeditiously, and it gives the department more time to bring costs recovery litigation after the final remedy has been selected and presumably is being implemented. If the Court has more questions, I will answer them. Otherwise, I will step down. Very well. Thank you. Thank you. Mr. Butler. Thank you, Your Honor. Very briefly. I believe that the Court was very correctly focused on the fact that the statute provides very, very detailed definitions of remedial action and removal action. Those definitions would be unnecessary if a removal action was commenced by or characterized by a document that says removal. Well, that's not necessarily so. I mean, couldn't the word, the removal action, be a term of art that means something that happens pursuant to a plan for, I mean, for a remedial action, plan for remedial action, and the definition having to do with what kinds of things ought to be incorporated in that plan, but not having to do with the definition of what a remedial action in the operative statute means? I certainly accept that, Your Honor, but what I'm trying to say is if the statute, if the scheme were focused solely on the title on paperwork, they wouldn't have had to provide these details, these detailed definitions, and the courts who have previously considered this would not have focused on the definitions as much as they have. Well, the courts could be wrong. But what the trouble of courts is that a statute of limitations is supposed to run from some ascertainable point in time. And I don't understand that you've given us one. Your Honor, if one looks at the October 1991 order from which Neville Chemical by which Neville Chemical was ordered to prepare a draft remediation plan, action plan, that order at Exeter Records 106 expressly says, most recently scheduled for cleanup. It estimates that the draft remedial action plan. Right. And schedule skips. It's a slip all the time. I mean, that doesn't prove that anything happened in January 1993. I mean, you're basically arguing, what you're really arguing for is a bright-line rule that it's a final remedial action plan. You're just arguing about what's the final remedial action plan in this case. No, I'm sorry, Your Honor, if I misspoke. What I'm arguing is if after you've had a final remedial action plan, a draft remedial action plan approved, you go in and you start doing physical activities that are the only remedial activities that are ultimately incorporated into the final remediation action plan, and in the context of a six-year statute of limitations in which the State has time to go through this hearing process and to check to see if the remedial actions are doing what they say. In that case, the commencement of those physical activities, such as installation of three wells in an extraction system, that is the only physical action that was required of medical chemical, that that does start the statute of limitations. The only other thing I want to point out here, Your Honor, is the State was talking about, counsel for the State, was talking about incorporation of removal into remedial action, and it is true that the AMD case says the fact that something that was going on during a removal action is incorporated into the final remedial plan doesn't mean that commencement of the removal starts the remedial action plan running. But once again, the thing that distinguishes AMD is the reason we believe it's such good authority from us. In AMD, the Court specifically said that there was no prior statement of what the remedial plan was going to be, and the State looked and said that the statute should begin running when the parties have sufficient information as to what the final remediation plan will be. And, Your Honor, as far as I'm concerned ---- And you think that was in January 1993? Absolutely. Why? I mean, you were just saying a little while ago that it was really because it turned out that that was the final remediation plan. But that's different. That's looking at it retrospectively. Your Honor, once again, if I misspoke, I didn't mean that it just turned out that way. It was the plan that was submitted with the intent that it would be the final remedial action plan. But you were told repeatedly thereafter that it wasn't. I mean, the agency kept telling you that this was an intermediate plan and that it wasn't final and that there had to be other alternatives and so on and so on. Your Honor, the statute doesn't require a final plan. The statute doesn't say that you have to commence all of the remedial activity. The statute says that the statute begins running with construction, on-site construction of remedial action. And we would urge the Court to make that, the real-world physical construction of remedial actions, the date on which the statute begins running. How can you know that on your team, other than retrospectively? The result of the later process had been that these wells were totally useless and that they were to be replaced by a completely different scheme. Then what? Your Honor, I would cite to the Navistar case in which instance the regulatory bodies went in and said the work that you have done so far is inadequate. This clay cap that they put on top of a problematic groundwater locus was not adequate and it had to be substantially replaced and other steps taken. And the Court still started the statute of limitations running from the date of commencement of installation of that cap. And unless the Court has any other questions, we'll submit. Thank you very much for your time. Thank you. The matter stands submitted. We'll take a ten-minute recess at this time. All rise.
judges: Pregerson, Fernandez, Berzon